Okay, we've consolidated for argument the first two cases, number 19-1290 and number 19-1699, Sanford Health Plan v. United States and Community Health Choice v. United States. I think we have questions about the finality of the judgment in the community health choice and main cases. And before we start the clock on the merits, we would like to get the party's views on whether we do have a final judgment over which we have jurisdiction. So, would the government please address that in the community health choice case? There's this joint status report, which is the order approved by the Court of Federal Claims, which appears to have the government reserving liability and damages arguments, and in particular, the question of whether there should be a reduction because of the tax credits. So, Your Honor, that was an argument that the Chief Judge rejected in the opinion, and we were just preserving it for appeal, just for clarity. Doesn't sound like that. I mean, I think this is the shared understanding of the parties, Your Honor, is that we made these arguments in our briefing to the trial court, and they were rejected. And we were just making clear that by stipulating to the quantum of cost-sharing reductions that would have been owed, we were not in any way forfeiting our ability to argue on appeal that the quantum should be reduced. But when she rejected the argument, it sounded as though she rejected it, said it hadn't been properly raised. No, I mean, the reasoning of the opinion, as understood by all the parties, was we weren't being given another opportunity to raise it. It was anticipatorily rejected, both as a matter of liability and as a matter of damages. We do not see it open from the trial court's perspective to make that argument absent of reversal. Did you brief the issue of the premium increases set aside or set off as a matter of damages? Sweeney seems to say, well, that was really only in the context of saying why there isn't a cause of action liability. We briefed it in trial court as a cause of action issue, but we understood the opinion not to leave room to renew before the trial court the argument in the context of damages. Yes, but was that because you didn't properly raise the issue or that the trial court was rejecting it on the merits? We took it as being rejected by the reasoning of the opinion. On the merits? On the merits. Rejected on the merits, yes. Okay. Is that the understanding? Is it Mr. Wolf or Mr. Roberts? Your Honor, I'm Bill Roberts for Community Health Choice, and our understanding is it is a final judgment that if affirmed would immediately become payable, and so we do not believe there is anything further for the trial court to do unless this court were to remand. And do you understand the court of federal claims to have rejected the damages argument on the merits? I would say on the merits, Your Honor. There was no dispute or discussion about whether the argument had been raised. I think, and I don't want to wade into the substance of the argument today, but I believe that Judge Sweeney viewed the issue as the same regardless of whether the government was arguing for a complete dismissal or a partial reduction. I think she viewed the issue to be essentially the same. And what about the same is true of the main case? Well, let's hear from the government first. Oh, forgive me, Your Honor. I haven't refreshed my reflection specifically on the main case, which came in very late. There's a joint status report that says we reserve issues for appeal, and then basically it says we also reserve this damages argument, which is somewhat unclear as to whether there is an issue being reserved at the trial level or only for appeal. Okay, thank you for the clarification. No, the government's intent was identical, and it's actually coming back to me that the three cases that Chief Judge Sweeney decided, there was a joint oral argument and essentially identical opinions. And we understood the opinions to have exactly the same effect, which is to resolve as a merits matter both the question of liability and the question of whether the damages should take into account the increased tax credit. When the parties presented the summary judgment motions and argued them and briefed them, was the assumption that the parties made that this was only going to be on liability? Your Honor, I didn't present the argument, and I don't want to state what might have been in counsel's head. Was it presented? This I don't know. Was it presented as an argument solely going to liability? Not that I believe, but what I would say with confidence is that the government in reading Chief Judge Sweeney's opinions took it to foreclose, to address in anticipation the merits of any damages argument in addition to the existence of a damages remedy. Is that counsel's understanding with respect to the main case also? Ed Handwolf from Maine, Your Honor. Yeah, and it's a bit of a strange posture for Maine because Maine stipulated to the same posture that Community Health Choice was in. And in the Maine portion of this case, we are actually, this was a stipulation of the parties, we are relying, we agreed not to brief it separately for Maine, and we're relying on the briefing of the parties between Community Health Choice and the government, but our understanding of the posture and how it was resolved by Chief Judge Sweeney is the same as Mr. Roberts reported. Just to be clear about that, in other words, that there is a final judgment, there's nothing left to be decided at the trial court, and that the trial court rejected the damages argument on the merit. That is how I read Chief Judge Sweeney's opinion. And that you're not making an argument that the constitutes a waiver of the damages? We will not be arguing waiver. We are prepared to... Well, I'm speaking for Maine. Okay, well, maybe we should hear... We are prepared to argue the merits of that issue. All right. Is that the same for the other parties? Yes, Community is prepared to argue. And you're not continuing as a waiver by virtue of the issue of premium set-ups not being raised in the damages context? Correct. Okay. It's subject to usual arguments about what evidence is a record. Yes. All right. Can I just ask, Community case, the judgment we have is a 54B judgment? Why? I think there was a risk-coordinated issue. Correct. There is an additional... Separation of the risk-coordinated part of the case. Now, just so that we touch all the bases here, in the Sanford and Montana cases, my understanding is the damages issue was not raised at the trial court. Is that correct? But I think we should hear from the government first about that. Sanford and Montana was a slightly different posture in that they brought separate lawsuits, first for the last quarter of 2017, later for 2018, still pending and stayed. And so... 2018. I'm sorry, 2018 and 2019, those have been stayed. And so it wasn't raised yet. And one of the reasons... It wasn't raised with respect to 2017. Correct. But it would have been premature, at least in the real world, because the 2018 increased tax credits had not yet happened. Okay. So, as the Sanford and Montana cases come to us, there's no damages issue in those two cases? There is... Correct that there's not the same damages issue. And a reason that we wanted to make sure the community case was before this court was to ensure that the court had all of the issues. May I say one thing? Yes. So, damages for 2017 are in the case and there is a final judgment on that. Ms. Klein is correct that 2018, not 2019, 2018 are parked at the Court of Federal Claims pending appeal. So, 2018 for Sanford and Montana was not resolved. Right. And as to 2017, there's no damages issue. Well, if by damages issue you mean this argument that the government has raised that there should be an offset, that's correct. 2017 is... But there is damages that have been adjudicated at the Court of Federal Claims. Correct. But there's no argument about the offset as to the 2017. Well, that's our understanding. I mean, I don't want to speak for the government, but that's our understanding. Well, just would the government confirm that as to 2017, there's no offset argument? Just because of the happenstance that it was brought as a series of lawsuits, not in a big picture sense that we would certainly be arguing it down the road if it came to that. So, in Sanford, you're not arguing either, the setoffs either as damages or going to the cause of action? Setoff is not the word we use. Well, I understand that. I'm now about to bleed into the merits. A reason that there is no cause of action is because of the relationship between cost-sharing subsidies and tax credits. Okay. Was that argument made in the Sanford? Yes. And so, to that extent, the argument regarding the premium increase, potential premium increases was made with respect to 2017? Yes. Okay. And in those cases? And in those cases. But not as to 2017 as a basis for reducing damages. Exactly. Not just with respect to those two and a half months in that lawsuit, which was filed separately. The argument wasn't raised in that context, but it would be raised in the case that's parked in the Court of Federal Claims if it came to that. And all these cases that are pending in the Court of Federal Claims, have any of them come to final judgment so they're on the way here, or are they all being stayed pending the outcome of this decision or the decisions of these cases? There are two cases in a similar posture in that 54B judgments were entered. One, they call it LEHA. I can't remember the full name. But it's, I believe, an abeyance in this court. And the other one, which is Common Ground, which is the class action, we very recently moved for abeyance. And I think just yesterday, the other side opposed abeyance. But those are the cases that are before the court. Abeyance, a motion for abeyance in this court? In this court. So there are two other cases that have come to this court. And is the government seeking abeyance in both of those cases? Yes, Your Honor. And that hasn't been decided yet? I believe it may have been by agreement in the first case. But the first case is held in abeyance? I have to go back and look, but I believe so, yes. I know we're not on our briefing time. And in the one, Common Ground, the class action, which was the very recent one, I know that the class counsel, I believe yesterday, just opposed abeyance. And that has not been decided yet. But just to be clear, the posture is the same. It's another 54B in which it's not materially different from these cases. All right. So, Ms. Klein, why don't we start here? Go ahead. I just want to make sure we don't have a confusion here, but I wanted to be clear that our view, and the government correct me if I'm wrong, that the alcohol, the quantum question, as opposed to the liability question, does not apply to the 2017 amount that was stipulated to the hospital. That's what I understood Ms. Klein to say. Okay, Ms. Klein. Just for Stanford and Montana, and just as of what's before the court right now. Yes. As the community choice, the argument is there's no injury, and as a result, no damages. No, but is there a damages calculation issue in community as to 2017? Yes, because we're regarding this as what is alleged to be a continuing violation. You look at the entire thing, and again, I'm bleeding it to the merits, because the increased tax credits were so substantial in 2018, and will be ongoing. They will dwarf the amounts that were not paid. That's confusing. I understand that it's a liability issue, and that is raised as a liability issue. What I think we're trying to clarify here is to Stanford and Montana, as to 2017, whether there is an argument that damages should be reduced, because of the premium increases and tax credit. Not as to Stanford and Montana, but yes, as to community. So, I mean, this may be a disagreement, but I just want to clarify from the government's perspective. I didn't think there was a disagreement. I didn't think so until now, Your Honor. What is the disagreement? Until counsel articulated it, I hadn't understood the government's position in the community case to be that the damages amount for 2017 should also be reduced. They're not arguing that. I understood. Oh, we are, yes. We're arguing in community, because the period at issue... No, no, community. But we're talking about Stanford and Montana. No, this is counsel for community. So, the issue is to 2017 in community? Yes, we're... I mean, I'll put it in crude terms. Community got so much more money in 2018 than it was... No, we don't need to... I think we understand the argument. Okay, and yet we're making... But it's a 2017 in community. Is there an issue that if government loses on liability, that damages ought to be reduced because of the premium increases and tax credits? Yes. And you think that argument was preserved, right? Yes, because it was rejected anticipatorily by the trial court, leaving no room to make it at what might have otherwise been a damages case. Okay. And what's community's position as to that? Well, we understood that to be the case with regard to the 2018. I would wonder if... Okay. Anything further? Well, Your Honor, because I spoke for Montana and Stanford, and you seem to be solid on that. I want to make sure that Maine... We also understand that 2017 for Maine, although the government has its liability argument, we've stipulated the damages for 2017, and there is no quantum issue for Maine, just like Montana and Stanford. What's the government's position, then? We stipulated for 2018 and 2017. That's just about the number of the cost-sharing subsidies that would have been paid had they been funded. That is not a waiver of the argument that that number, 2017 plus 2018, should be the actual damages, regardless of the large increase in tax credits for 2018. Okay. So it sounds to me as though everybody's agreed, except with respect to 2017 for community in Maine, where there's a difference between the parties as to whether the damages issue was properly preserved. Is that a fair statement? That sounds fair, yes. Other comments? Yes. Sounds right to me, Your Honor. Yes, Your Honor, I agree. Okay. Which may bring us back to the question of whether the summary judgment motions were directed at solely at the question of liability, because if they were... If the summary judgment was contemplated to affect damages as well as liability, then there may be a waiver, if you didn't raise it in those cases with respect to 2017. Well, the summary judgment only addressed liability by its terms, but the reasoning of the trial court's opinion... Well, I understand the judgment either may or may not have gone beyond the scope of what the parties adjudicated between themselves or believed was going to be at issue. But that doesn't mean that... I mean, what we need to understand is, in order to determine down the road, perhaps, whether there's been a waiver with respect to damages as to 2017, is whether that was the way the summary judgment proceeding was presented to the parties at the time. Was it... Put it simply, was the government not at fault for not litigating damages with respect to 2017, because it expected only liabilities to be at issue? Yes, that's exactly. The government imagined there might be a later damages phase, but it became academic as a result of everything. And then Judge Sweeney said, no, I can decide the damages issue as well. Yes. Okay. I mean, not in so many words, but yes, that's how everyone read the opinion. But there's a separate question about preservation or waiver if you look at the joint status report of 267 to 269 and the community case about whether you really reserved for 2017 what you did expressly reserve for 2018 about the subtraction of tax credit receipts. I would have to look back. I thought our language was quite broad. It was meant to reserve all arguments other than the number. It's under a heading addressing 2018, previous separate heading under 2017, but that maybe you could address later. What is the, what are the private parties positions as to why there was a waiver for 2017 in the community in main cases? Two points, Your Honor. One is the point that Judge Braun just noted, stipulation does distinguish between the two years and the agreements of the parties regarding the significance of those stipulated numbers. We do know as well that Judge Sweeney, Chief Judge Sweeney's order at page 23 does treat 27 distinctly and separately from 28. Indicates that at a minimum community has entirely recovered the cost and reduction payments that the government did not make for 2017. And then goes on to with respect to 2018 and then addresses the tax credit. But what about the summary judgment motion? Was that limited to liability and not addressed to them? The motion sought summary judgment of liability. We did put into the record the exact amount that was proposed for 2017. 2018 amounts were substantively adjusted by counsel to some extent. Did you make an argument in moving for summary judgment that there should be no reduction of the damages because of the premium increases in tax credits? We argued that that was no defense to the judgment in our favor. Well, there's no defense to liability. There was at that moment, the government had not argued about one at all. So, yeah, okay. Anything further? Yeah, all right. All right, let's start the clock then, Ms. Klein. May it please the court, Elisa Klein for the United States. Turning, of course, to the antecedent issue of liability. There are a number of legal issues. The central legal issue. Is this going to be resolved in the mode of case if the government loses the mode of case? Does the mode of case govern liability here? No, Your Honor, and I'll focus on the issues that are unique to these cases, which actually do turn on the hydraulic relationship between sections 1401 and 1402 of the ACA, which are the tax credit and the cost-sharing subsidy provisions. And just going back to the legal question is whether the Affordable Care Act can fairly be interpreted to mandate damages as compensation for cost-sharing subsidies that Congress has declined to fund. And there are a number of reasons that answer is no, some of which do overlap with MODA. But in particular here, even assuming it would ever be appropriate to interpret a statutory directive to an agency to make payment without regard to the Antideficiency Act, and even assuming it would ever be appropriate to conclude that Congress intended implicitly a damages remedy for Congress's own funding decisions, it would not be appropriate here because of the text and structure of the ACA, which means that if Congress doesn't fund these cost-sharing subsidies directly, you know, as HHS had requested through an annual appropriation early on, they just end up being paid by the government indirectly. In the form of increased premium tax credits. And, you know- So in other words, the premium tax credit issue isn't presented in MODA, and that's a distinguishing feature for this- Yes, yes, your honor, that's correct. And also just to be clear, these points though, you know, they may be unfamiliar in the general sense. These are very familiar for anyone who's looking at the Affordable Care Act and understands the basics of health insurance pricing. It, you know- How can that be a defense to liability as opposed to an argument for damages reduction? Because the question is whether to interpret substantive law, the ACA, to provide a damages remedy that Congress did not explicitly provide. That's just a statutory interpretation question. And the language the Supreme Court has used in Navajo Nation too and informs is whether the substantive law, so here the ACA, can fairly be interpreted as mandating compensation for damages sustained as a result of, and here it would be Congress's funding decisions that made it impossible for HHS to pay these cost-sharing subsidies directly. And as with any question of statutory interpretation, you don't just look to, you know, a phrase in isolation of the statute. You consider the text and structure of the provision and related provisions. And here, this, and this, I'm now going to go back a few years, as was anticipated back in 2015 when HHS first looked at the question, what would be the consequences if we were not to pay cost-sharing reduction subsidies directly? And the bottom line, and this is in the, that asked the issue brief, it's cited in our brief, but also quoted in the common ground amicus brief that the class submitted before this court. In effect, the federal government would pay cost-sharing reductions indirectly through increased premium tax credits. And it goes on to say, at much greater total expense, the expense is greater because of, again, the text of the ACA, which makes tax credits not only linked to certain benchmark premiums, but it makes those tax credits available to a significantly larger universe of people than the people who are getting the reduced cost-sharing by virtue. But the relationship between the increased tax credits and the benefits to the insurance company depends, does it not, on the willingness of the state regulators to adjust premiums? Well, this is where, again, I'll refer to the common ground amicus brief. This is an amicus brief on the other side by a hundred insurers. And what they say correctly is insurers have to price premiums to recoup their costs. One of their costs is, if they're told, lower your deductibles for a certain category of insureds, it's kind of like night follows day, they have to raise their premiums. And the insurance- Well, but they're not necessarily free to raise their premiums if state regulators don't permit them. Well, but the state regulators, and Congress enacted the ACA against the background of the state regulation. The state regulators, one of their most important responsibilities is to ensure the solvency of the insurers. Right, but if you happen to be in North Dakota, why does an insurance company that's doing business in North Dakota, where the insurance premiums were not allowed to go up, why do they benefit from the premium tax credit increases? Actually, let me address North Dakota and Vermont were two states that, to be clear, they've all gone up. Now, it was just because of particularities of the Vermont and North Dakota markets that they couldn't go up as quickly as in all of the rest of the state. The District of Columbia is also different, but the Medicaid program there is so generous, covers so many people that you don't have a significant issue of cost-sharing subsidies. So that was just an accident of history because HHS, in retrospect, mistakenly paid these cost-sharing amounts from the wrong funds, from the permanent appropriation for tax credits for a number of years. And when it eventually came to appreciate that no, that was not permissible, the announcement was made in late October, 2017, and just happened to be in two states, that that was too late for them to make the adjustment. But then they did make the adjustment the following year. There's no question that when Congress, back at the dawn of time when Congress enacted the Affordable Care Act, it would have known that it didn't fund the cost-sharing subsidies. And if future Congresses didn't choose to fund the cost-sharing subsidies, premiums were gonna go up. That's the point that the common ground amicus brief stresses correctly and so heavily, that that's just axiomatic as a matter of health insurance pricing. And then the other piece, it just flows directly from the text and structure of the ACA, which is that if benchmark premiums go up, tax credits go up dollar for dollar. And in fact, because so many more people get tax credits than these cost-sharing subsidies, the result, the bottom line, is more federal spending and no damages. So it's unsurprising that Congress did not provide a damages remedy explicitly, and it would be wholly unwarranted to imply one or to infer one in the provision that where Congress didn't provide it. Do I remember correctly that while you cited some, I don't know, 2014, 2015 materials about this understanding of the relation between the premiums and the insurer's costs, you haven't cited anything from prior to the enactment of the ACA? There's not much legislative history on the ACA, but these points are not actually in dispute. I mean, they flow directly from the text and structure of the ACA. It's the same type of information that the Supreme Court- There's some particular dispute about the role of competition and who would pocket the increased premium taxes, right? What's not, what can't be in dispute, and again, this was, there actually was in the California district court litigation that we quoted and cited in our brief, there was an evidentiary hearing and Judge Tavner did actually look at these issues now in the real world once, in fact, cost-sharing subsidies were not being directly made, what happened to the states and who- But as I understand your argument, you have an argument at this point, as I understand it, correct me if I'm wrong, is that the understanding of the likely relation between premiums and insurer's costs was so widespread, so clear that one must understand what Congress did in 1402 against the background of that, and therefore Congress would have expected, if not a perfect solution outside a damages remedy, something so close that it didn't contemplate a need for a damages remedy. Yes. Okay, and so I guess you're talking then about the Congress that enacted the ACA, from which I would, I guess, expect to see some materials, not in Congress because of the unusual process, but somewhere from that time expressing everybody's, whoever everybody is, understanding of the relation between these two things on which you rely for an interpretation of what is a 2010 congressional attempt. Well, here's what I can give the court. Although this particular issue of cost-sharing subsidies and premiums wasn't addressed with specificity, the big issue that the Congressional Budget Office did address before the ACA was enacted and its key issues in health insurance reform was what happens when premiums go up. And that very explicitly was as a result of the structure of the ACA's tax credit provision. Tax credits go up as well, absorbing the impact of premium increases. This was a big issue just because it depends about- I mean, I think people understood that, but why does that lead you to a construction of the statute that there shouldn't be any damages remedy? I mean, is there any case that interprets a congressional statute that way because it wouldn't work right? I mean- Well, there is no case that interprets a statute to say a claimant gets a damages remedy because Congress has declined to fund a program. I know there's claims of a century, but we have said repeatedly, we can't find a single case- That seems to be a different argument, but we'll get to that. It is, it's the- Yeah, obviously this is the Mota argument, but just to put in context, there's no case that has ever awarded damages as essentially compensation for Congress's own funding. Now we're- It sort of depends what you want to say about Langston. So there was no judgment. But that's a big thing, which means there's no question of implying a damages cause of action, which the Supreme Court hasn't done for quite a long time just in general, and certainly didn't do in Langston. But now we're coming to this case would take it to a whole new level, which is, again, I'm going to read this line from the HHS analysis back in 2015, what happens if cost-sharing reduction subsidies aren't paid directly. In effect, the federal government would pay cost-sharing reductions indirectly through increased premium tax credits. So to say that in that universe, which Congress would have understood, no, if you don't pay the subsidies directly, they're going to come up, they're going to come out in the increased premium tax credits, that we should also infer that Congress wanted a damages remedy that it did not choose to enact explicitly would be taking the absence of precedent for any damages remedy when what you're talking about is a, quote, injury caused by Congress's own funding decisions. And here, there's not even an injury. But this argument wouldn't help you if in modus in court decides that the statute resulted in an implied impact contract, right? So I should make sure I address the contract issue because the argument that you could imply a contract- No, but before you get to that, try to answer my question. My question is, if Moda finds that there was an implied impact contract, the argument you've just been making about congressional understanding of the premium and tax credit operation wouldn't affect the implied contract argument, right? It would, because the question is, looking at the language, all of the language of the statute, did Congress have an intent to enter into contract? And for the same reasons, we've just been discussing that particularly- It's Judge Dyke's question, but that seems to me to fight the premise. I think the premise of the question, as I understood it, is that, say, the Supreme Court decides that in the risk orders program, there was an implied impact contract. So we're no longer talking about the statutory obligation. At that point, aren't you left as the premium tax credit only, though this may be a very big deal, with damages reduction? No, because- First, I want to clear up. We don't believe if the Supreme Court goes back and looks at the cases that this court recently reviewed in the American Bankers Association case, cases like Dodge and Wisconsin and Michigan Railway, that the Supreme Court could possibly conclude there's an implied impact contract in Moda. But even imagining- You may surprise us. The petitioner's counsel expressed the hope that the Supreme Court would go back and read that line of cases, and we very much share that hope, because we think this court was 100% correct in its recent American Bankers Association case to say that there is an incredibly strong presumption against treating a statutory benefits program as finding the government in contract in situations far more sympathetic, where you had public school teachers where the statute said, if you work 20 years and then retire, you shall be entitled to $1,500 annuity for life. And then the legislature later cut it to $500, and they said, wait, we relied, you know, we worked 20 years, then we retired, and you cut it, that's a breach of contract. And the Supreme Court said no contract. You know, it's a similar thing, the railway case, where the law said, if you build your railway in our state, you get a 10-year tax exemption. And the railway company built the railroad, and then the legislature repealed the tax exemption, and the answer was, sorry, we don't treat statutes as contracts. So just to be clear, we trust that the Supreme Court is going to go back and read their precedents, the ones this court reviewed, and is not going to find an implied impact contract. But hypothetically, imagining that they did, they would have to be concluding from the ACA that Congress had an intent to enter into risk corridors contracts. And though we don't know how they could say that, here you would look and think, contracts, this is just, that the requirement to reduce cost sharing, you know, so like smaller deductibles, that's just classic insurance regulation of the sort that Congress has done for decades and has done in other ACA provisions. It's not different in kind from saying insurers have to cover prescription drugs, which the ACA also said. All of that just means premiums are higher. So there's no contract. There's just a mandate under the commerce power. And it happens that Congress also chose to have a, authorize a targeted form of subsidy because this was a targeted form of regulation. But by not funding the subsidy, there's no breach of contract. It just means that the premiums would go up, which is, of course, exactly what happened. It won't turn to damages. So I think I understand the argument for damages reduction. If there's a breach of contract theory here, I'm less clear about the argument for damages reduction. If it's a statutory fine. Well, and the briefing, the briefing hasn't exactly been expansive on these points. It's not, but again, we are hypothesizing now an implied damages remedy. So if the court were going to interpret the ACA to conclude that Congress actually intended some form of damages remedy, then the question would still remain what kind of damages remedy? Is it one that does or does not take into account the massive increase in tax credits that resulted from Congress? Well, what's happened in other areas where there's been statutory claims? Is this, has this ever come up before? The question of damages reduction to a statutory claim. I don't know of any case I couldn't find any case where you had this kind of hydraulic relationship between the cost-sharing subsidy on the one hand and the tax credits on the other. There's sometimes there are cases that are cited on the other side about antitrust and kind of pass through to consumers, but that's not what we're talking about here. We're talking about the government actually its own outlays increasing by substantially more than the cost-sharing payment. I don't know if this is relevant, but what about a sort of kind of statutory damages action, title seven or something with damages and somebody gets fired and succeeds in winning a claim that says the firing was unlawful. If that person right after getting fired went and got a higher paying job, does that factor into the damages award? I don't know. And I can assume not. I think if it's an unrelated. You assume not. Well, I'm going to assume not because I don't know. I mean, there's a generally you have an obligation as an employee in my understanding. After you've been terminated, you can't simply go home and sit there and wait for your judgment. You have to go out and try to find a job. If you find one, the amount of your loss is calculated by the difference between your old job and your new one. Isn't that right? Okay. Again, because I haven't briefed this. I didn't want to speak out of turn. But if that's right, this is even easier because the insurers don't have to even do anything. But then on the other hand, there are other doctrines like the collateral source doctrine where you don't count money that the insurance company may have paid you for your injury, for example, in a toy case. So what? That's actually what I had in mind. And my point is that this is not a collateral source. These are two provisions, adjacent provisions of the ACA that are hydraulically linked as written by Congress. And the idea that if you are implying a damages remedy, again, the court is essentially writing the remedy and deciding its scope that you wouldn't think about the fact that if cost sharing subsidies aren't paid directly, they get paid indirectly. If they're not paid under 1402, they get paid under 1401. It's hard to imagine why, what rational Congress would have so intended. Unless the court has further questions, I'll reserve my time for rebuttal. Okay. Let me ask one other question. This is raised, excuse me, by the opposing counsel's brief. Is your argument with specific reference to the Anti-Deficiency Act looming there? Pardon me. I'll get the question now. Are you in effect saying that every statute necessarily is read to say, every statute providing for a payment from the government is necessarily read as saying subject to appropriations, even if that language is not in the statute? That's basically your position, is it not? Yes, with an important caveat that this court flagged in the Prairie County decision. Well, there's some statutes like the Medicare Part D statute and one that was flagged in Prairie County that actually make explicit that this provision represents the obligation of the government and provides authority to make payment in advance of appropriations. So we're not saying that Congress cannot, if it wants to make something, an obligation in advance of appropriations, Congress can do that. But if you just have basically language like this, which just says, agency acts, you shall make payment, that there's no question that the Anti-Deficiency Act prohibits the agency from making the payment unless and until it gets the appropriation. And that's true whether or not Congress makes explicit in that substantive law that this is subject to appropriation. But the fact that the Anti-Deficiency Act may limit the ability of the officers to make the payment doesn't necessarily speak to the question of whether a judgment can be entered, which is, I take it, the distinction that's drawn in several of our cases. And in fact, there's a line in MOTA to that effect. There is a line regarding a stick to a MOTA to that effect. We don't believe there's any. That is the most recent statement by this court on that question, right? We do not believe there's any holding. And obviously, the Supreme Court will address this. And one thing I just want to underscore was also underscored by the Deputy Solicitor General on the Supreme Court argument that it is a mistake, particularly the ACA, to accord significance to that subject to the availability of appropriations language. If you just compare, for example, two ACA provisions, 5301 and 5303, they're essentially identical. One is a discretionary grant program for dentistry training, and the other is a discretionary grant program for general family medicine and other training. The language is largely identical. They're clearly both discretionary. The one has subject to the availability of appropriations, and the other doesn't. And the point, just being the one that the Chief Justice emphasized in the King decision, which is that the canon against surplusage is a feeble canon to begin with, and particularly so if you're looking at the ACA. We just think it's a mistake to accord significance to that. Okay. Thank you, Mr. Ewell. Good morning, and may it please the Court. I'm Dan Wolfe. As we discussed earlier, I represent Sanford and Montana, and then also Maine, and Mr. Roberts at council table will stand up separately to address community health choice. The government in this case invites complexity where there is none. This is first and last a case about statutory interpretation. You are not called here to adjudicate health care economics, the policy choice of Congress. Well, it's not just about statutory interpretation since there's the implied impact contract there. Well, it is. It is. But we start with the statute because that's where our complaint and argument starts, and we can talk about the implied impact contract. Ms. Klein said- Well, you don't believe in the implied impact contract theory, right? Absolutely. And it's even stronger in this case than it was in MOTA for the reasons laid out by Chief Judge Sweeney. And I'm happy to start there if you would like. No, no, just go ahead. But 1402, Ms. Klein said that one reads a statute taking in the text and the structure. And that's true. But what you don't do is abandon the key term that governs, which in this case, he shall make. And I would submit to this court, you've already decided this case. You decided this case in MOTA. And MOTA just tracked a long line of cases before that. Importantly here, and I'm going to go to this because- But you said a long line, and you said that in your brief, and I looked at the long line. And as far as I can tell, the long line of cases prior to MOTA is really just Green Hill, Prairie, and Langford. Are there any others that we should be looking at? In this court, there is decades worth of money mandating statute jurisprudence. Well, I understand that. But with respect to situations where there is a pay, but no appropriation, a directive to pay, but no appropriation that covers that, what other cases are there besides those? Well, the key cases, we have Langston, of course. Then we have the key claims court cases that date back to the 19th century, like Collins and Ferris, which point out that you don't need an appropriation for the court to sit in judgment of liability. And Ms. Klein, on behalf of the Department of Justice and the government, said there are no cases. Is that liability if there's, for example, a tort, something like that, the judgment of liability. But if you have a directive to pay money and there is no specific appropriation that's applicable to that directive, in this case, are there any other cases with those facts other than the ones that- Well, Slattery confronts this directly by saying we don't consider appropriation in deciding whether there's a money mandating statute that gives this court jurisdiction to adjudicate liability. The Supreme Court's case in Rama says the same thing, and I quote- The contract case. But the principle there is the same. And with respect to the CSR program that was being argued in the Burwell case in the District Court of District of Columbia, where the House of Representatives challenged the prior administration's use of the appropriation that was set aside for the premium tax credits to use to pay CSR payments. The government says, and I quote, the mere absence of a more specific appropriation is not necessarily a defense to recovery from the fund, citing Salazar v. Rama. So the government, frankly, agrees with us, at least in other settings, that an appropriation is not necessary for this court and the court of federal claims below it to adjudicate the wholly distinct question of liability. And that's the centuries-old proposition that we're citing because that's what's key here. Now, let's take, Judge Bryson, your question about the presence or absence of limiting language like subject to the availability of appropriations. We've judged that you were on the Greenlee County case, which looked at the Payment in Lieu of Taxes Act, which was also at issue in Prairie County. And in that case, this court pointed out the significance of Congress limiting the exposure of a FISC through the use of the words subject to the availability of appropriations or words to that effect. And importantly, we don't have that here. And you can't just dismiss the absence, Congress's choice not to use those words as meaning nothing, as assuming, Judge Bryson, when you asked Ms. Klein, that you can't take the government's position, which is, well, with or without that language, we should assume it's always there. That's not true. The ADA, the Anti-Deficiency Act, only speaks to government agents. It only limits the ability of government agents to pay when there is no appropriation, which we are not challenging HHS's, the propriety of HHS, not cutting the check to the CSRC or when the Attorney General, Jeff Sessions, told it to stop. By the way, just a small detour. Is that why you could not succeed in an APA challenge? Well, we don't have an APA challenge. I know that. That wasn't the question. Is that, obviously, we're talking about something that Bowen discussed a lot about the two possible ways of challenging this. If you had brought an APA action, would the Anti-Deficiency Act have precluded you from prevailing in that act against HHS because you couldn't issue an order to them to pay? Well, I do think, and I do think that if some other entity had gone to federal district court to challenge HHS cutting off, in fact, I believe the California v. Trump case, although that was decided at the preliminary injunction phase, that may have been an instance of that, although the court didn't ultimately get to the merits because it only ruled on a preliminary injunction. But to take just a step back and take the hypothetical, I think that under the APA, if one were to go to federal district court and argue that HHS was arbitrary and capricious for not paying CSR payments pursuant to section- No, it wouldn't be an arbitrary and capricious argument. It would be an argument that the statute obligated the payment. It doesn't matter at all. Well, but in an APA setting, in an APA setting, the argument of law, the response would be, well, the ADA prevents it. And the ADA does prevent it. But the ADA says nothing about our ability to come here to the court of federal claims and seek judgment on liability for damages. Two totally different cases. And as a matter of fact, and I'm going to reference some footnotes in the Bowen decision, because there's Justice Scalia's dissent, of course, which we cite- Of which there were many. But footnotes, 31, 39, 42 all spell out that the majority in the dissent weren't that far apart. It was just on the specific case of Medicaid, which involves programmatically complex overlap and cooperation between the federal and state governments. One of those footnotes, maybe 42, suggests something kind of limiting about the kind of cases that he didn't have in front of it, but the kinds of cases that would be in the court of claims or the court of federal claims about the damages for retrospective harm. Is this one of those? No, footnote 42 only addresses why in the majority's opinion in that case, where the state was seeking equitable relief on a going forward basis. But Medicaid didn't provide the answer, but it distinguished cases, statutes like the Backpay Act, which also have the shall pay or shall make language. With a character, this is what I guess I'm remembering, with a characterization of those Tucker Act cases as involving a kind of harm already done for which a recovery was being sought. Would this case fall into that? Or are you saying that's just not as limiting as it might sound? Well, this case falls into the, and I'm not sure I'm understanding the line you're drawing. This case falls into the Greenlee County, the Aguiac, the line of cases where shall means shall. And that's an important point. Because at the end of the day, the government really doesn't confront what shall make means. It doesn't mean shall make. So we've been, I think you've been talking till now entirely about a matter that's in front of the Supreme Court right now. What about the distinct argument that this particular statute, because of the relation between, is it 1401 and 1402, would warrant- And as Chief Judge Sweeney and the other two judges that rule below Judge Kaplan and Judge Wheeler found, there's no support to find that the relationship between 1401 and 1402 limits the 1402 obligation. So for example, you would expect to find that if Congress really intended this, first of all, you would expect that Congress intended to do what Congress wrote. Shall make means shall make. You would expect to find if there was this coupling to be made, some kind of reference shall make if state regulators don't do this about premiums. And you don't have that language. There is no limitation. And in fact, I'll point to- It would be kind of odd that they would anticipate that the funding would be cut off. Well, that's the whole point is that the Congress that wrote this, and the question was asked, Congress in 2010, what it intended. It intended that the 1402, that the CSRs be paid. And as a reference again, and this is in section, this is Appendix 145 of the Community Health Choice Brief. This is the Attorney General of the United States at the time, Jeff Sessions, talking about how the two programs are distinct. He says each is authorized by a separate provision, separate title in the U.S. Code. They have a different focus. They each have a different eligibility formula. He goes on to say that it does not mean that CSR payments are the same as tax credits under 36B. That was, I'm sorry, that was in support of the legal conclusion. That was why the tax credit for 1401 shouldn't apply to 1402. Really? Can you let me finish my question before you jump in? I'm sorry, I thought you had them. Thank you. That was in support of the conclusion that the tax fund was not a source of properly authorized appropriations, right? Correct. The argument from the government is that everybody understands the, I think the word is, hydraulic relationship between what happens to premiums and these kinds of costs. And therefore, not on the question of whether Congress intended the amounts that it says shall be paid to be paid. Of course, it expected that. But whether for the separate part of the inquiry into money mandating character or not of the statute, Congress expected under the fairly discernible standard that damages would be a remedy if that obligation was not carried out. And the government doesn't have a single case to support it, Your Honor. Every other case where that has been, where Tucker Act jurisdiction has been displaced, there has been a judicial remedy. So in Bowen, there was the APA. In Borms, there was the Fair Credit Protection Act, or I might be messing up that name. There was a judicial remedy. Here, we're left with no remedy. And to Judge Bryson's earlier question to my friend for the government, this is to assume that Congress left the remedy up to 50 states plus other territories that have their own programs. And to infer that as an intent of Congress would be unprecedented. And the better way to think about this is as Judge Sweeney and as Judge Kaplan, Judge Wheeler look at this, which is we take 1402 for what it is. It says you shall establish a program. You require the plans to make payments. And then you say you shall make that up to them in a dollar for dollar reimbursement. That's how 1402 should be interpreted. In this case, this court's money mandating cases are in full support. Let's turn to the damages before we run out. I would like to turn there. Because is there really any argument on contract theory that there should be a damages reduction if in fact, the health insurers receive payment through the premium increases and the credits? Your Honor, there is no damages offset whether we're talking about a statutory claim or a contract claim. We'll talk about the contract claim first. Why is there an offset? Because the American rule is, in this case, in this court said it in Hughes Communications, which was a case not cited, but it's a recent, relatively within the last two decades, contract decision from this court. And I think Mr. Roberts will amplify this. So even in a contract setting, like the RICO setting or like the NHS setting, we don't look to what costs got passed on. And there's an important reason for that. One is what I was sorry to refer to earlier, which is Attorney General Sessions. I don't understand that. Costs that are passed on. The question here is if as a result of the government's breach, the insurers receive compensation through the tax credits, why doesn't the objective of making them whole for any losses have to take account of it? Because for mitigation or offset purposes, you don't look at separate transactions for the same reason that Judge Bryson's example, or let me say, let's say that our plans got an angel investor from say the Bill and Melinda Gates Foundation. I heard that CSRs aren't being paid dollar for dollar. Here's a check. That's not an offset because it comes from a different source. And here we're talking about the same thing. The relationship between the- Indirectly. Indirectly. The premiums are a relationship between the plans and the consumer. Not all consumers get reimbursed from Congress. Some have to pay it out of pocket. It's only the eligible insurers that get reimbursed. Just because Congress has a separate policy decision chooses to subsidize those payers. That doesn't change the nature of the relationship between the consumer- The money goes to the insurance companies, right? I'm sorry? The money goes to the insurance companies. From the consumer, which happens to be subsidized by Congress. Actually, the tax credits, though earned by the consumer, actually go to the insurers, right? The plans are a conduit. That is correct, Your Honor. But the fund of a premium is quintessentially a contractual relationship between the consumer and the plan. It's not, as Chief Judge Sweeney said, payment from tax credits don't equal payment for CSR. They're two totally different things. I commend you to Jeff Sessions' opinion on this, which is at, again, Appendix 144, 145 of the Health Choice Joint Appendix. He sets it out. We're talking about two different things. In all the cases, all the cases would deem this to be a pass-on defense that is not recognized because there isn't going to be, at the end of the day, any kind of windfall or double recovery. As the government puts in footnote 11 of this- Why not? Well, as the government hides in footnote 11 of the Sanford brief, at the federal level, there's something called the medical loss ratio, which limits the amount of revenue a plan can keep- It has to do with the calculation. Which is exactly why the court- Which is not before us. The basic question before us is, if the insurers are made whole through tax credits, why should they recover an additional amount pursuant to either the contract theory or the statutory theory? They are not made whole, Your Honor. They are not made whole- We don't know that. One of the problems with the way this was briefed, both in the trial court and here, is that we're sort of on our own because Judge Sweeney decided the damages issue in one paragraph on A23 and presumably with no briefing on the- specifically on the damages issue. And here we are with- You all have given us a total of about six pages of briefing on this issue and no elaboration of any of the details that you've both been talking about in conflicting terms as to whether there is, isn't, or is sort of is, or sort of isn't, a recovery by the insurance companies. But the question is, if the insurance companies get indirectly or directly from the government all the money that they were deprived of and the cost sharing, should they still get, in effect, a double recovery? That legally, to me, that seems to be the question that what you're suggesting, I think, yes, is the answer to that. I'm saying that the premise that they're getting a double recovery is incorrect. But that's the issue that wasn't- The calculational issue. And that was never briefed before and was not briefed before us. It's a legal issue, I would say, Judge Dyke and Judge Bryson, for the reasons set out in the Kansas, the Utility Court case, Southern Pacific case, the Hughes Communications case. And I'm going to let Mr. Roberts amplify this because he states them in his brief. As a legal matter, the courts simply don't allow the other side to bring in, as evidence of mitigation, these sorts of costs that are passed on. The question is what's encompassed within these sorts of costs. Thank you. Okay. Thank you, Mr. Roberts. Thank you, Your Honor. With the court's permission, I'll jump into the discussion as it is flowing and discuss the damages question and whether premium tax credits can, in some form, either eliminate or reduce the appropriate damages amount in this case. Just take a hypothetical. Let's assume as a result of the premium increases and the tax credits for a particular year that the insurer is made whole. Why should the insurer get double recovery? What is the theory as to why that should happen? The theory is based on prevailing law going back to 1918 with Justice Holmes' case of the Southern Pacific Railroad that a person who fails to pay an amount due or overcharges, in the antitrust context usually, is not entitled to take advantage of the victims passing on some or all of that nonpayment to their customers through price increases. But that's quite different. This is the government paying twice. I disagree with the court's analysis there. This is exactly similar. The only difference is the government separately under a different program in a different part, 1401, agreed to help out our customers to pay their premiums to us. But it is a distinct transaction not with the government but with the customer. Just as a matter of policy or logic, why should the insurers recover twice? The policy or logic is that our government needs to hold itself accountable when it fails to follow through on an unambiguously mandatory obligation to pay CSR reimbursements under 1402. Punitive or deterrent effect of a judgment? I would not say that you would end up with a double recovery but the government learned its lesson. Well, there's more to it than that. I would not say punitive. But I do think it is an important principle with our law that the government should be held accountable under the same circumstances as a private party based upon the same kind of wrongful conduct. What we have here is a violation of a statute similar to an antitrust violation or a breach of a contract which the Hughes case talks about. So one reason for the rule that does not allow the wrongdoer to take advantage of a passing on of costs through a price increase is that we need to hold the violator accountable. But there's more to it than that. In addition, there is the policy concern that in the law of damages, we look at the immediate direct consequences. We have a non-payment. There is a very clear and really undisputed direct injury. The exact amount of money that this statute orders the government to pay pursuant to 1402, that is damage. Any damages treatise will agree that is direct injury known. The question is whether the government is entitled to bring in an affirmative defense, in effect, and say, yes, I owe you that money, but you got it from another source. Perhaps that source ultimately was a different fund of money that comes out of the government, but it is another source. And therefore, I don't have to pay you what the statute required me to pay you. Can I ask you this question? If you recovered the full CSR payments here, say for 2018, and you've already gotten some premium increase for the same year, would you expect state regulators, say for 2021, to lower your premiums, to recoup the excess you got? There are legal safeguards to prevent windfalls and excess profits for insurance companies. The exact mechanisms could vary state to state, but I think it is clear that either in the form of rebates or adjustments of other premiums, insurance companies are not going to be allowed to simply pocket this money. Okay, that may be true, and that might affect the damages calculation, but what is that possibility? Meaning that if, in fact, you do get double recovery, that shouldn't be allowed? Well, it addresses a concern that the government suggests there will be a giant windfall to the insurance company and this money will not be... I think we have to assume for purposes of deciding this that there is a possibility of a windfall, and the question is whether the government is going to be able to prove the windfall. I understand that comment. We disagree with it because we don't think... The government has grossly oversimplified the way this market works. Fine, I mean, I can't do that in a damages calculation proceeding before the Court of Federal Claims. But ultimately, we do agree that as a matter of law, this is not a defense the government is entitled to raise either with respect to liability or damages. And in order to address that head-on, I agree with Your Honor's distinction between the statutory claim and a breach of contract claim. Regarding the statutory claim, we have a money mandating statute like the salary cases from long ago. This statute is very specific. It instructs the government who to pay and exactly how much to pay. The remedy under the Tucker Act is to address the loss of the legal right to compensation that has occurred here, and that legal right is for the amount that the statute specifies. Why isn't there a separate question of liability and remedy in, you know, I guess I'm thinking of one analogy maybe not familiar to you in the patent world, in the eBay context, the Supreme Court said, the statute says you have a right to exclude. Separate question of remedy about whether you actually get an injunction to exclude. And I think it said something somewhat general about right is one question. And here's a right that you're asserting is a right to have make, payments made. But the question is what, a separate question, what is the remedy for the violation of that right? And now we're talking about having to draw on remedial principles. Well, I would say that the law, it is true. We have not found a case that discusses specifically whether the government is entitled to raise offsets or a defense like the passing on defense in response to a violation of a money mandating statute. I don't know that there is such a case. Certainly there's not one suggesting they can. And in my judgment, the answer in that vacuum is to look at the statute and apply the statute as written and enforce it as written. That is what the three judges below have all done in response to this situation. I think that's particularly appropriate given that there truly is no textual hook or legislative history hook whatsoever, respectfully for the government's argument here. The Publications Council mentioned from 2015 is an HHS issue brief. That's not legislative history by anyone's definition. And there is simply no committee report, no discussion, no floor discussion, anyone suggesting that there should be a linkage, let alone the kind of linkage that's being advocated here between the payment of CSRs and the premium tax credits. They truly are distinct programs serving distinct purposes. The premium tax credits help the consumers afford to buy the insurance. The CSRs help them afford to use it to get health care. Those are two different things. And the statute designs them to be two separate payments out of two separate buckets. And it is simply not appropriate to offset one for the other. And there's no indication that Congress intended that to be the result here. With regard to the contract claim and the law we cite in our brief on the passing on defense, it is a proposition that does prevail throughout the law. Judge Easterbrook talks about this in the Carter v. Berger case, that, as I say, passing on of pricing increases by the victim of a wrong does not give a defense to the wrongdoer. And it's generally true. I mean, that was an antitrust case, I think. And it's generally true in tort cases as well. But there, there's a deterrent slash punishment feature. I wonder if that principle applies in this case. Yes, we think it does. And the Hughes case, which, by the way, is at 271 F. 3rd, 1060, and specifically 1072 is the section. This is an affirmance of the Court of Federal Claims exclusion of a government defense from a trial where the government was trying to reduce the damages to Hughes Satellite Company by the amount that Hughes recouped. I'm reading, quoting from the case here, recouped by increasing prices to customers. In other words, by the amount Hughes quote, passed through to its customers. The Court of Federal Claims did not allow the government to assert this defense. That was affirmed by this court back in 2001. And it recognized the same principles we mentioned in our brief. As Justice Holmes said, that wasn't the case either where the government was paying twice, right? Well, I'm sure the government was arguing, you're asking me to pay damages to Hughes. They got their damages recovered when they raised their prices to their customers. I'm sure that was the argument. But the government was not in turn paying the customers the increased price. Not to my knowledge. That's a big difference. That's a collateral source rule in tort. If the money coming to you is not from an insurance company, but is from the victim ultimately, then the collateral source rule doesn't apply. I think that that would be a matter of... Right. I don't think that's necessarily true. I think there would have to be an agreement between the wrongdoer. That's not my understanding of the rule. But go ahead. In this context, we have a breach of contract. And the other important policy reason that drives the notion that we should not go to this next step of looking at the price increase to our customers and the implications is it is a remote set of events from the actual non-payment. And it opens up a can of worms regarding what is the actual overall economic impact of the government's violation here. This is a complex marketplace. There are lots of consequences to the government's non-payment of the CSRs. Some perhaps do create some additional revenue. It's possible to the insurance companies, but others drastically reduce it. In our case, we know that the sales of CSR policies, the silver plans have gone down a lot for community as a result of these non-payments because they've gotten more expensive. There are other unknown consequences. And the courts recognize that this is not a task that is appropriate to ask a trial court to do, to do the kind of complex reverse engineering economic analysis to try to figure out the overall economic effects of this wrong. Rather, the law looks to the direct and proximate issues and concludes, we have a clear violation. We have a clear amount due. That should end the matter. And that's what the doctrine stands for. And we think it applies here, particularly in light of the fact that we have a money mandating statute that does not provide for any offset. I have a couple of minutes. I'll address the implied in fact contract. If the court will entertain that. We do have union enmity below here too. Both Judge Sweeney and Judge Wheeler found an implied in fact contract. Judge Kaplan did not address the issue. So she did not rule one way or the other. We certainly do acknowledge this court's ruling in the Moda case that there was no implied in fact contract under the risk corridors program. But we think this case is distinct on that issue because unlike there where this court found no, none of the trappings quote unquote of a contractual agreement. We think those trappings very much exist here. If one looks at 1402 in the very same section of the statute, it creates reciprocal obligation. The government must make these payments. The insurance companies must provide the reductions to their insurance. They're both reciprocal obligations. The statute can be viewed as an offer. The insurance company's performance of the duty of providing these reductions can be viewed as an acceptance of that offer and a delivery of consideration to the government in exchange. Why isn't it the case though that as Ms. Klein argues this is more in the nature of insurance regulation where the government simply says this is, these are the limits on what you can do. And oh, by the way, we're going to ameliorate the harshness of our regulation by giving you funding for this as opposed to being a contract in which parties have a mutual meeting of the minds. Well, the banking case that the government recently cited to the court is different in that there was a bit of cherry picking going on by the plaintiffs. One, they were pulling obligations out of separate provisions of that statute and trying to cobble something together. Here, it's all together right in 1402. And the connection, the reciprocity is very direct. The government has to pay exactly the value of the reductions that insurance companies provide to the insurance. It seems much more like a reciprocal obligation than simply a regulation. And certainly the lower court viewed that way. And I do think it is significant as well that the government did perform under this arrangement for 45 months, three and three quarters years before it stopped payments. And we do think that the New York Airways case, which is significant for a number of points at issue in this appeal is also quite relevant on the implied in fact contract claim. And so it should be considered. I do want to conclude with my last 15 seconds here with... Well, you actually don't have 15. I don't. Well, oh, I'm over here. Well, we appreciate the court's indulgence. And I do think it's important. There is an important broad policy here of... I think you're out of time. Okay. Thank you, Your Honor. Ms. Klein. Your Honor, I'll be brief. Just quickly on reciprocal obligations. These are not reciprocal obligations. And it doesn't matter that the two instructions are in 1402. If you look back at Dodge, it was one sentence that basically said school teachers who work 20 years shall be entitled to $1,500 a year. And that packaging did not make it an implied in fact contract. Here, there's an insurance regulation. Lower deductibles and co-pays for a certain category of insureds. There was no funding for that in the ACA. The consequence, Congress never chose to fund it, is that premiums went up. And here, just to refer the court again to the common ground amicus brief, page nine in the block quote. This is the amicus brief for 101 insurers on the other side, says if the federal government did not reimburse insurers for cost sharing reductions, insurers would increase plan premiums to cover these costs. As a result of the ACA structure, these higher premiums would translate into higher federal costs for premium tax credits. And moreover, because many more people are eligible for premium tax credits than for cost sharing reductions, the result would be a substantial increase in federal costs. That's the 2015 document. This is common ground quoting the 2015 document. So I just want to make clear that this is not just us speaking. It's not just HHS in 2015 speaking. This is the class action by 101 insurers on the other side. Acknowledging. If you have any cases, you can point to that. And I'm not going to be very precise here, but that we lie for an inference about congressional intent on a kind of everybody knows the way this market works kind of field. Well, I think if the court looks at the Supreme Court's decision in King, essentially, the Supreme Court King versus Burwell, the Supreme Court rejected the type of approach that the insurers are advocating. The insurers there said, look, it says exchange established by a state. Read no further. That doesn't mean exchange established by the federal government. And the Supreme Court said, no, we don't just look at that phrase. We look at in the context of the ACA structure, tax, other provisions. And that's all we're asking here, which is don't look at this snippet in 1402D that says HHS shall make these payments. And in fact, if you do look just at that, you really should be looking at the Anti-Deficiency Act, which says HHS don't make these payments until we give you the funds. But more generally, if you were thinking about, well, what would Congress have intended if it thought these particular subsidies aren't going to be funded? It certainly wouldn't have intended to penalize the future Congresses for exercising their appropriations prerogative by making the FISP pay out twice. It just doesn't make any sense. And there's no case that's like that. So, and just to clean up two small points, the phrase money mandating can be confusing. And I just, as we understand the Greenlee County decision, the court has treated a much lower bar for Tucker Act jurisdiction than when saying, well, our limits on funding gonna foreclose liability. And so we have argued these cases as the absence of funding foreclosed liability rather than as jurisdictional, just because that's how we understand this court's precedent. And finally, Highland Falls illustrates the point that Congress is not a wrongdoer if it chooses not to fund its own programs. That's an exercise of its appropriations prerogative. And it's not a basis for implying damages, remedy, liability, however you want to put it. What is the best case that you have for us to look at that would stand for the proposition that the insurance company, if the insurance companies are getting a benefit from the tax credits, that their damages should be reduced? The very best case, the closest analogy to that. So on the contract point. No, no, on the statute. Assuming we don't have the contract. I can only respond to their argument. They're arguing about just general pass-through principles. So the fact that a victim of a wrongdoing passes the cost along to customers doesn't make the wrong, excuse the wrongdoer from paying. But here, first, we think it's wrong. It doesn't require the victim to surrender part of the recovery. Right. But here, first, it's wrong to conceptualize Congress as a wrongdoer. But further, we're talking about, again, this just all goes back to the hydraulic connection between 1401 and 1402. And we don't know of any. You have no case that's ever talked about this, anything like this hydraulic connection that you keep referring to. Not like this as a damages issue. It's, again, I can just go back to King, which is when you're trying to discern Congress's intent. And that's a question, both if you think of it as a liability question or as contours of the damages remedy. You have to think about the related provisions. It's also a very high level of abstraction. I'm looking for some help that's a little closer to the actual facts that we have here. You have, I think you're telling me that there isn't a case that you- We didn't find a case, but we didn't find contrary authority either. We just don't have a case because it is unusual for an entity that's actually gotten payments from the government that compensate them for the very subsidy to then come in and say, we also should get damages. We're just not familiar with that ever happening. Okay. Thank you. All right. Thank you. Thank all counsel. The case is submitted.